UNITED STATES of America,
Plaintiff–Appellee,

v.

Scott ALLEN and Maurice Allen,
Defendants–Appellants.

Nos. 89–3237, 89–3482.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 7, 1990.

Decided April 26, 1991.

Patrick Kelley, Asst. U.S. Atty., Springfield, Ill., for U.S.

Richard Black, E. St. Louis, Ill., for Maurice Allen.

Peter K. Woody, Springfield, Ill., for Scott Allen.

Before POSNER, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Linda Bivens, an undercover agent with the Illinois State Police, accompanied a confidential informant to an apartment in Springfield, Illinois, to purchase cocaine. The informant knocked on the door at the top of the entrance stairs and stated her name. An intercom telephone sitting on the steps rang. The informant answered and stated her name again. Scott Allen met them at the door and led them into the apartment.

The informant introduced the agent to a man called "Pie Head." This man was Maurice Allen—a relative of Scott Allen. The informant told Maurice she had brought Agent Bivens with her so she could buy some cocaine. Maurice determined that she wanted an eighth of an ounce and told the agent the price would be $300. While Scott watched, Agent Bivens handed Maurice Allen $300 in cash. Maurice walked into the bedroom and pulled a curtain across the doorway, and Scott went into the kitchen. When Scott came back, the informant asked if he had gained weight. Scott responded by lifting the front of his sweater to expose a handgun shoved into the front of his pants. Scott then walked into the bedroom.

Scott emerged from the bedroom, went to the back door and returned with a man and a woman. All three walked into the bedroom together. The two unidentified individuals subsequently left the room. The woman was carrying a mirror on which there were several chunks and white powder. Scott then came out and handed the agent a package of cocaine.

Upon leaving the apartment, the intercom phone rang again. The informant answered and handed the phone to Agent Bivens. She told the agent that "Pie Head" was on the phone. Maurice told the agent that when she came back to the Springfield area she could buy cocaine from him again.

Bivens, the surveillance agents who were stationed outside, and the informant then drove back to police headquarters. One of the surveillance team members showed Agent Bivens photographs of Maurice and Scott without revealing their names and asked her to identify the men in the pictures. She correctly identified Maurice and Scott from their respective photographs.

Maurice and Scott Allen were indicted and charged with: conspiracy to distribute cocaine in violation of 21 U.S.C. § 846; distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and carrying a firearm during a drug offense in violation of 18 U.S.C. § 924(c)(1). A jury found both defendants guilty as to all counts. Maurice and Scott each received an aggregate term of imprisonment of fourteen years.

This is a consolidated appeal from the convictions. Scott Allen alleges that the district court erred in allowing Agent Bivens to correct her misidentification of him during her direct examination at trial. Scott also alleges that it was improper for the government to pursue federal charges against him because he believed that his guilty plea to state charges arising out of the same events would dispose of all pending criminal charges against him. Maurice Allen claims the evidence was insufficient to convict him of the crimes charged.

■ We begin our analysis of this appeal by addressing the claims of Scott Allen. First is his claim of evidentiary error. During the government's case-in-chief the agent who made the drug buy was asked if she recognized "the person who answered the door." She responded affirmatively and the Assistant U.S. Attorney asked her to identify him. Then the following exchange took place:

(Direct Examination of Agent Linda Bivens by Mr. Kelley, AUSA:)

A   He is the fellow right there.

Q   What's he wearing?

A   He's wearing a tan—I'm sorry, a white shirt, sweater.

Q   Would he be the—

A   The subject with the beard. I'm sorry, they both have—

MR. KELLEY: Your Honor, may I ask the witness to stand up and point out the Defendant?

THE COURT: Walk right down there, please, and stand by the person that you wish to identify.

A   This is Scott Allen.

MR. KELLEY: Your Honor, may I approach the bench?

THE COURT: Yes, you may.

(Off the record discussion at the bench.)

Tr. at 13–14.

During the "off the record" discussion at the bench, the Assistant U.S. Attorney indicated to the court that Agent Bivens had identified the wrong defendant and requested a recess. A recess was granted by the judge. Defense counsel then moved to prohibit any further identification testimony by Agent Bivens. The court denied the motions, noting that the misidentification was not a matter of "lying under oath." The judge also commented that both Scott and Maurice Allen had very similar physical characteristics. Finally the court indicated that defense counsel would be given wide latitude to explore the identification issue during their cross-examinations.

After the recess, Agent Bivens returned to the stand and the direct examination was resumed. She was asked whether she was certain her earlier identification was correct. She responded, "No, I'm not. The gentlemen look very similar right now. They looked a lot different when I bought the cocaine from them." Following further testimony regarding the difference in the appearance of the defendants between the time of the offense and trial, Agent Bivens was again asked to identify the man who let her into the apartment at the time she purchased cocaine. The testimony then continued as follows:

(Direct Examination of Agent Bivens continuing:)

A   If they could stand up, I could probably tell a little bit better.

[AUSA]: Your Honor, I would ask leave for the witness to go over and examine—

THE COURT: She may and they will please both stand if they will. Thank you.

A   This gentleman here is Scott. I was wrong the first time.

Tr. at 33. Later, during cross-examination by counsel for Scott Allen, the following testimony was elicited:

(Cross–Examination of Agent Bivens by Mr. Woody:)

Q   Officer Bivens, at what point in time did you realize that you mis-identified the Defendants in this matter?

A   Once I had walked over there and I had already—once I had walked over and I pointed out that Maurice was Scott, in fact that was not correct.

Q   At what point in time, at the point and time that you got back to the chair?

A   Yes, sir.

Q   At the point and time you heard Mr. Kelley's comment that you mis-identified the Defendants?

A   No, when I got back up here and sat down, I realized I had.

Q   You got up there and sat down. Why didn't you indicate to the Court or Mr. Kelley or the attorneys involved that you mis-identified the Defendant?

A   I don't know, sir.

Q   You got up from that chair and you walked directly to the individual you

had been describing, you described him first from the stand; is that correct?

A  Yes, sir.

Q  As being the individual in the light shirt?

A  Yes, sir.

Q  And you walked directly to the individual that you believed to be Scott Allen; is that correct?

A  Yes, sir.

Q  Thank you.

Tr. at 62–64.

The government again pursued the identification issue on re-direct examination, eliciting testimony that Agent Bivens had changed her mind about the identity of Scott Allen once she had returned to the witness stand. The following questions and answers were then made:

(Re-direct Examination of Agent Bivens by Mr. Kelley, AUSA:)

Q  What caused you to change your mind?

A  I remembered that Scott was the one that had—his hair was thinner on the top.

Q  When did you observe that today?

A  Today I paid more attention. Once I got up here I glanced back over and realized.

Q  Do you have any doubt in your mind now about which Defendant is Scott Allen and which Defendant is Maurice Allen?

A  No, sir, I do not.

Q  You have no doubt at all about the identifications you made earlier?

A  No, sir.

Tr. at 66. During re-cross examination by counsel for Maurice Allen, Agent Bivens was asked whether she realized her mistake before Mr. Kelley approached the bench and she responded, "Yes, sir." Finally, Scott Allen's attorney, on his re-cross examination, again delved into Agent Bivens' misidentification of the defendants. Agent Bivens acknowledged she was sworn to tell "the whole truth and nothing but the truth" and the following exchange ensued:

(Re-cross Examination of Agent Bivens by Mr. Woody:)

Q  But a crucial issue in this case being the identification of people you didn't pay much attention to and you just got up from that chair and walked to counsel table and mis-identified people?

A  Yes, I did.

Tr. at 70.

■ The general standard of review to be applied to a district court's decision regarding the admission of evidence is abuse of discretion. *United States v. Bigelow*, 914 F.2d 966, 971 (7th Cir.1990); *United States v. McNeese*, 901 F.2d 585, 598 (7th Cir.1990). The reviewing court "gives special deference to the evidentiary rulings of the trial court." *Id.* Unless Scott can show the trial court committed a clear abuse of discretion, the decision regarding the admissibility of evidence must stand. *Id.*

■ More particularly with regard to the credibility of in-court identification, the rule is that it is to be resolved ultimately by the jury after the defendant has had an opportunity to test the accuracy of an identification through cross-examination. *United States v. Davies*, 768 F.2d 893, 904 (7th Cir.), *cert. denied*, 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985). Only where the identification (or in this case the corrected identification) creates a danger of unfair prejudice or of misleading the jury which substantially outweighs its probative value may it be excluded. Fed.R.Evid. 403.

Here, the agent's initial misidentification of Scott Allen, as well as her subsequent corrected identification of him, was made before the jury. There is no indication or allegation that Agent Bivens was coached during the recess which followed her misidentification. The misidentification was extensively explored through the cross-examination of defense counsel and the re-direct examination of the government prosecutor. No one stood in any better position to judge the credibility of the witness than the jury who heard and saw her change her testimony. The district court did not commit error in allowing Agent Bivens to correct her identification. The court's ruling was consistent with case law and Rule 403.

■ Scott Allen's second issue, argued somewhat cryptically, is that the federal charges against him should have been dismissed because he pleaded guilty to a number of state charges before the start of his federal trial. He argues that because the earlier charges resulted from the same state investigation he was led to believe that the federal charges were also being disposed of by his plea of guilty in state court.

The federal government was not a party to the state plea negotiations. Scott points to nothing in the record that indicates the plea agreement dealt with federal charges or that any promises or commitments were made to the defendant with respect to federal charges. There was no allegation that state officials were acting on behalf of the federal government for purposes of plea negotiation. Scott points only to his understanding that his plea would dispose of all charges surrounding the state investigation.

■ In general, the federal government is not bound by a plea agreement entered into in state proceedings. *United States v. Long*, 852 F.2d 975 (7th Cir.1988); *United States v. Long*, 511 F.2d 878 (7th Cir.), *cert. denied*, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975). We think Scott is in a position similar to that of the defendant in the 1988 *Long* case, where we noted:

> [The defendant's] mistake was that he assumed he would only be prosecuted in state court for his Tazewell County crimes. He can complain of nothing but his own ignorance of the law. Understandably, [the defendant] was disappointed that the same Tazewell County events also led to a federal prosecution and conviction. However, hindsight realization that a deal was not as good as originally hoped for is not sufficient reason to suppress such evidence [in the federal proceeding]. It was [the defendant's] failure to foresee that his conduct violated federal law that led to his present frustration and not any wrongdoing on the part of the County or the government.

*Long*, 852 F.2d at 978. With no support aside from his allegation of misunderstanding, Scott's argument regarding the failure to dismiss the federal charges must fail.

■ Maurice Scott's sole claim is that the evidence was insufficient to support his conviction of the crimes charged. Specifically, he argues he did not join the conspiracy, and that he did not know that Scott was carrying a firearm. Addressing the first allegation is necessary before addressing the second.

■ We have recently enunciated our standard of review with regard to joining a conspiracy. *See United States v. Durrive*, 902 F.2d 1221 (7th Cir.1990). When the defendant brings a challenge, the standard of review to be applied is whether there is substantial evidence connecting the defendant to the conspiracy. *Id.* at 1228–29. We continue to "review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government." *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984)), *cert. denied*, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). "We must determine whether any rational trier of fact could have concluded that [the defendant] was guilty of the crimes charged beyond a reasonable doubt." *Durrive*, 902 F.2d at 1225. This court will overturn the verdict "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *Id.* (citing *United States v. Grier*, 866 F.2d 908, 923 (7th Cir.1989) and *Nesbitt*, 852 F.2d at 1509).

Viewed in the light most favorable to the government, there is substantial evidence linking Maurice to the conspiracy. Maurice was present in the apartment during the drug transaction. He told the agent the price for an eighth of an ounce of cocaine. He took the money for the cocaine from the agent. He was present in the bedroom from which the people emerged with the mirror containing chunks and powder, and Scott emerged with the cocaine. He called

the agent as she was leaving and told her he would sell her cocaine again upon her return to Springfield. This is not, as Maurice would like us to believe, mere association with a conspirator. Maurice was an active participant in the conspiracy to distribute cocaine.

Finally, we must determine whether the evidence was sufficient to support Maurice's conviction for carrying a firearm during a drug offense. Maurice alleges he did not know Scott was carrying the gun. But Maurice and Scott were co-conspirators. Under the doctrine set forth in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), "one conspirator can be held liable for the crimes of another if committed in furtherance of the conspiracy." *United States v. Paiz*, 905 F.2d 1014, 1025 (7th Cir.1990) (quoting *United States v. Manzella*, 791 F.2d 1263, 1267 (7th Cir.1986)), *cert. denied,* — U.S. —, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). The *Pinkerton* doctrine may be used to impute a firearm violation under 18 U.S.C. § 924(c)(1) to other members of the conspiracy. *United States v. Ocampo*, 890 F.2d 1363, 1372 (7th Cir.1989); *United States v. Diaz*, 864 F.2d 544, 548 (7th Cir.1988), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989). To apply the *Pinkerton* doctrine, the jury must be instructed in an intelligent manner on this theory of guilt. *Paiz,* 905 F.2d at 1025.

Our review of the record convinces us the jury in this case was properly instructed. The possession of weapons is all too common in the course of drug dealing. A rational trier of fact could have reasonably found that Scott's possession of the gun during the transaction was in furtherance of the conspiracy to distribute cocaine. Consistent with the *Pinkerton* instruction, the jury found Maurice guilty of the firearm offense because of his relationship as a co-conspirator with Scott.

For the foregoing reasons, the convictions of Scott Allen and Maurice Allen are

AFFIRMED.